# EXHIBIT 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*, | : | Case No. 1:13-cv-503 |
| GLENDA OVERTON, | : | |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| THE CHRIST HOSPITAL, INC., | : | |
| | : | |
| Defendant. | : | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (Doc. 11)

This civil action is before the Court on Defendant's motion to dismiss (Doc. 11)

and the parties' responsive memoranda (Docs. 13, 14).

## I.     FACTS <u>AS ALLEGED</u> BY THE PLAINTIFF

For purposes of this motion to dismiss, the Court must: (1) view the complaint in

the light most favorable to the Plaintiff; and (2) take all well-pleaded factual allegations

as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

### A. Background

Plaintiff is a former employee of The Christ Hospital ("TCH"). (Doc. 5 at ¶ 11).

From 2008, until Plaintiff's termination in November of 2012, Plaintiff held the position

of the Graduate Medical Education ("GME") Administrator for TCH. (*Id.*)

TCH is a nonprofit hospital located in Cincinnati, Ohio. (Doc. 5 at ¶ 13). It is also

a teaching hospital. (*Id.*) Teaching hospitals provide clinical education for medical

school graduates who are completing several years of supervised, hands-on training in a

particular area of expertise such as primary care, internal medicine, geriatrics, surgery, *etc.* (*Id.*)  Medical and surgical services provided by a resident are paid by Medicare through Direct Graduate Medical Education ("DGME") and Indirect Medical Education ("IME") payments.  (*Id.* at ¶ 14).[1]

### B. Medicare Regulations Relating to the Payment of GME Direct and Indirect Costs

TCH has an approved medical residency program pursuant to 42 C.F.R. § 413.75(b)(2)(1) and 42 C.F.R. § 415.152.  (Doc. 5 at ¶¶ 37, 38).  The calculation of payments for GME costs is set forth in 42 C.F.R. § 413.75.  That section provides:

> A hospital's Medicare payment for the costs of an approved residency program is calculated as follows:
>
> (a)  Step one.  The hospital's updated per resident amount (as determined under § 413.77) is multiplied by the actual number of FTE residents (as determined under § 413.79).[2]  This result is the aggregate approved amount for the costs reporting period.
>
> (b)  Step two.  The product derived in step one is multiplied by the hospital's Medicare patient load.

(*Id.* at ¶ 41).

The manner in which a full time equivalent resident is considered for purposes of obtaining reimbursement from Medicare is set forth in 42 C.F.R. § 413.78 which states:

> (a)  Residents in an approved program working in all areas of the hospital complex may be counted.
>
> (c)  No individual may be counted as more than one FTE.  A hospital cannot claim the time spent by residents training at another hospital.

---

[1] TCH derives and continues to derive substantial revenue from the Medicare Program.  (Doc. 5 at ¶ 18).

[2] FTE is an acronym for full time equivalent.  (Doc. 5 at ¶ 39).

> Except as provided in paragraphs (c), (d), and (e) of this section, if a resident spends time in more than one hospital or in a nonprovider setting, the resident counts as partial FTE based on the proportion of time worked at the hospital to the total time worked. A part-time resident counts as a partial FTE based on the proportion of allowable time worked compared to the total time necessary to fill a full-time internship or residency slot.

(*Id.* at ¶¶ 42, 43).

42 C.F.R. § 413.75 states that payments to TCH for its GME resident costs is contingent upon compliance with various Medicare regulations. Specifically:

> Direct GME payments: General requirements.
>
> (a) Statutory basis and scope- (1) Basis. This section and §§ 413.76 through 413.83 implement section 1886(h) of the Act by establishing the methodology for Medicare payment of the cost of direct graduate medical educational activities.
>
>> (2) Scope. This section and §§ 413.76 through 413.83 apply to Medicare payments to hospitals and hospital-based providers for the costs of approved residency programs in medicine, osteopathy, dentistry, and podiatry for cost reporting periods beginning on or after July 1, 1985.

(*Id.* at ¶ 36). To include a resident in the FTE count for a particular cost reporting period, the hospital must furnish the following information:

> The information must be certified by an official of the hospital and, if different, an official responsible for administering the residency program.
>
> (1)   The name and social security number of the resident.
>
> (2)   The type of residency program in which the individual participates and the number of years the resident has completed in all types of residency programs.

(3)     The dates the resident is assigned to the hospital and any hospital-based providers.

(4)     The dates the resident is assigned to other hospitals, or other freestanding providers, and any nonprovider setting during the cost reporting period, if any.

(5)     The name of the medical, osteopathic, dental, or pediatric school from which the resident graduated and the date of graduation.

(6)     If the resident is an FMG, documentation concerning whether the resident has satisfied the requirements of this section.

(7)     The name of the employer paying the resident's salary.

(*Id.* at ¶ 40).[3]

In calculating the proper reimbursement of medical services for internal and external residents who train at TCH, federal regulations require TCH to maintain financial data based on audit quality documentation that allows the proper determination of costs payable to ensure that the claimed services were actually provided prior to payment. 42 C.F.R. § 413.20(a) and 42 C.F.R. § 413.24(a). (Doc. 5 at ¶ 44).

**C. TCH's Implementation of Its Medical Residency Program**

Beginning on or about 2007, TCH took on the responsibility of billing for its residents. (Doc. 5 at ¶ 45). TCH maintained that it would request reimbursement for 66.77 FTE residents. (*Id.* at ¶ 48). These residents are divided into internal and external residents. (*Id.* at ¶ 45). The internal residents are specifically contracted by TCH to perform medical resident duties and may be outsourced to other area hospitals for

---

[3] *See* 42 C.F.R. § 413.75(d).

medical resident duties at those hospitals. (*Id.*) External residents are residents contracted by other third party hospitals to perform services at TCH throughout the year. (*Id.*) In order to bill and be reimbursed by Medicare for the services of the internal and external residents' services, TCH is required to maintain audit quality financial documentation identifying when, where, how and in what manner the medical residents performed services. (*Id.*)

Plaintiff claims that TCH violated the False Claims Act ("FCA") between 2007 and 2012 by submitting false Form 2552 cost reports for reimbursement relating to individual resident services. (Doc. 5 at ¶¶ 44, 45, 46, 58, 59, 64; Exs. 12 and 27). The false scheme allegedly occurred by virtue of TCH's violation of 42 C.F.R. §§ 413.20 and 413.24 in failing to maintain sufficient financial records and statistical data regarding its medical resident program. (*Id.* at ¶¶ 59, 60 117, 121, 129). Plaintiff also claims that TCH violated its Corporate Integrity Agreement ("CIA") by failing to notify the government of the overpayments it received by virtue of its false cost reports. (*Id.* at ¶ 2).

### D. Plaintiff's Employment With TCH

#### 1.  *2008*

In January 2008, Plaintiff was hired as the GME Administrator for TCH. (Doc. 5 at ¶ 49). Upon being hired by TCH, Plaintiff claims that she discovered numerous violations relating to TCH's federal obligations when billing Medicare for reimbursement of its FTE medical residents. (*Id.*) Prior to 2008, no person had held this position at TCH, because it relied upon the Health Alliance and the administrative staff at University

Hospital in Cincinnati to calculate GME reimbursement.[4] (*Id.*)

In the course of performing her job duties, Plaintiff found that various departments at TCH were operating without program coordinators.[5] (Doc. 5 at ¶ 50). The absence of coordinators prevented TCH from appropriately tracking and monitoring its external medical residents. (*Id.*)

Plaintiff claims to have found additional deficiences in TCH's tracking of its medical residents program. (Doc. 5 at ¶ 51). On October 13, 2008, Plaintiff sent an email to Berc Gawne, M.D., Vice President and Chief Medical Officer at TCH, indicating that for the previous ten years, there was no record of nurse anesthetist medical residents or the duties they performed. (*Id.*) Plaintiff noted:

> We really need to make a decision and move forward, otherwise the rotation will either come to a temporary halt, or cause extended rotation time which creates a big problem for all involved. We currently have Nurse Anesthetist rotators on site now without any info on them- (who are they?, who are they training with?, how long will they be here? - credentialing/licensing? - etc).

(*Id.*, Ex. 3).

Throughout 2008, Plaintiff attempted to identify the external medical residents who had performed services at TCH, the nature and extent of those services, and the dates services were performed. (Doc. 5 at ¶ 52). Plaintiff determined that TCH had no audit

---

[4] The Health Alliance consisted of five hospitals: University Hospital, Christ Hospital, St. Luke's, Jewish Hospital, and Fort Hamilton. It was disbanded in 2006. *See Health Alliance of Greater Cincinnati v. Christ Hosp.*, No. A-060199, 2008 Ohio App. LEXIS 4991, at *1 (Ohio App. Sept. 30, 2008).

[5] Plaintiff identified these departments as Ophthalmology, Otolaryngology, Radiology, Emergency Medicine, Orthopedics, Pediatric Orthopedics, and Psychiatry. (Doc. 5 at ¶ 50, Ex. 2).

quality documentation to satisfy federal health care regulations for Medicare reimbursement.  (*Id.*)

On October 16, 2008, Plaintiff received an email from Mick Welscher, a consultant hired by TCH to identify the appropriate number of residents engaged in the GME Program in order to corroborate its Form 2552 request for reimbursement.  (Doc. 5 at ¶ 53).  In the email Welscher wrote:

> Nice to meet you and I greatly appreciate your willingness to jump head first into the fire.  I've attached the Federal Regulations that relate to both IME and GME reimbursement from Medicare.

(*Id.*, Ex. 4).

That same day, Plaintiff wrote to Drs. John Schroeder, Michael Jennings and Berc Gwane, senior officers at TCH, indicating that their Medicare cost report requesting reimbursement for medical resident expenses was insufficient.

> All
>
> I met with Mick Welscher who is a consultant out of Louisville (hired recently by John Renner) to complete the Medicare Cost Report for 2007 - 2008.  He said Medicare has already paid TCH 12 million dollars for this time period.  So far, the info he has from TCH does not come up to par.  We very well may need to pay back quite a bit of money if we don't come up with the info he needs.  So far, I have been able to come up with some of the data he needs that will support the 12 million from medicare that we have received.

(Doc. 5 at ¶ 54, Ex. 5).

In an effort to educate senior officers at TCH regarding its reporting requirements, Plaintiff forwarded them the CMS cost reporting guidelines on November 19, 2008. (Doc. 5 at ¶ 55).  This is the first time any individual associated with TCH familiarized

themselves with the regulations relating to medical resident reimbursement. (*Id.*, Ex. 6).

Because TCH personnel were unable to generate the necessary audit quality data to support its request for reimbursement, TCH contracted directly with another third party to prepare the resident counts for 2007 and 2008. (Doc. 5 at ¶ 56). On November 26, 2008, Susan Greenwood-Clark completed the resident counts for the primary care residents for the period of July 1, 2006 through June 30, 2007 and forwarded them to TCH. (*Id.* at ¶ 57). Greenwood-Clark prepared the counts based on information she received from TCH. (*Id.*) Plaintiff claims that this information was unsupported by verifiable documentation. (*Id.*)

Medical resident reimbursement is based on two separate requests: direct and indirect reimbursements. (Doc. 5 at ¶ 58). Direct reimbursements include a calculation of time specifically provided by medical residents relating to the completion of their duties while at a Medicare certified hospital graduate medical program. (*Id.*) Indirect costs are those overhead costs that are associated with medical residents. (*Id.*) The reimbursement of both areas is based upon the hospital's calculation of FTEs that are performing services over a fiscal year. (*Id.*)

On or about October 29, 2008, TCH filed its CMS-2552 for fiscal year 2007 which contained requests for reimbursement for external medical residents for which Plaintiff claims TCH had no supporting documentation. (Doc. 5 at ¶ 59, Ex. 7).[6] Similarly, Plaintiff also alleges that TCH had no supporting documentation for reimbursement of its

---

[6] TCH's direct cost reimbursement submissions indicate that in 2007 Medicare paid TCH $2,819,962 in direct resident costs. (*See* Doc. 5, Ex. 7 at 123-124).

direct and indirect costs for the external medical residents during 2008. (*Id.*) To prepare the reimbursement request, TCH again sought the services of Susan Greenwood-Clark. (*Id.* at ¶ 60). On November 26, 2008, Greenwood-Clark prepared a spreadsheet identifying the total resident trainees between July 1, 2007 and June 30, 2008. (*Id.* at ¶ 61, Ex. 8).

Later in 2008, Plaintiff discovered that TCH had submitted a request for reimbursement to CMS for its IME and GME costs and had settled on various reimbursement payments. (Doc. 5 at ¶ 62). The IME and GME costs associated with the hospital inpatient and outpatient activities and the payments received at TCH for 2008 were as follows:

**Hospital Inpatient**

|  | Cost Report | Interim | Lump Sums | Settlement |
|---|---|---|---|---|
| IME | $6,747,714 | $7,397,230 | ($92,662) | ($556,854) |
| IME-Capital | $396,839 | $417,547 | - | ($20,708) |
| GME | $2,388,272 | $2,433,736 | ($148,978) | $103,514 |

**Hospital Outpatient**

|  | Cost Report | Interim | Lump Sums | Settlement |
|---|---|---|---|---|
| GME | $512,531 | $541,399 | - | ($28,868) |

(*Id.*, Ex. 9). These amounts were based in part on a report prepared by a third party consultant, BKD, LLP. (*Id.* at ¶ 63). The first report identified that TCH employed

medical residents during that fiscal year 2008. In the report, BKD identified the total weighted GME employed residents at 43.94. (*Id.*, Ex. 10). BKD identified the total contracted medical residents for which TCH intended to bill Medicare as 21.91. (*Id.*, Ex. 11). These resident figures were derived from information provided by TCH. (*Id.*) In providing this information to BKD, Plaintiff claims that TCH had no audit quality documentation to support a request for reimbursement for the contracted medical residents in 2008. (*Id.*)

On December 10, 2008, TCH submitted its final CMS-2552 for 2008 to Medicare for reimbursement. Again, Plaintiff alleges that it had no verifiable medical documentation as required by federal health regulations. (Doc. 5 at ¶ 64, Ex. 12).[7]

### 2. *2009*

Plaintiff claims that TCH continued to improperly account for the external medical residents. (Doc. 5 at ¶ 65). For example, on April 2, 2009, Carol Laux, a cost reporting and cost accounting manager from Children's Hospital, forwarded a letter identifying the agreed upon resolution relating to overlapping resident rotation between TCH and the Children's Hospital. (*Id.* at ¶ 66, Ex. 13). Plaintiff claims that TCH agreed to the resolution because it had no independent verifiable data as to when the Children's Hospital medical residents provided services at TCH. (*Id.*)

Pursuant to the letter, TCH and the Children's Hospital agreed to a percentage of medical resident FTEs that each would submit to the Medicare fiscal intermediaries for

---

[7] The direct GME reimbursement request was $2,900,803. (Doc. 5, Ex. 12).

reimbursement from Medicare. (Doc. 5 at ¶ 67). Plaintiff alleges that TCH's residents billed without the required supporting documentation. (*Id.*) Plaintiff claims the same type of reimbursement occurred on a yearly basis with University Hospital. (*Id.*) TCH would regularly agree to reimburse University Hospital for medical resident rotations because TCH could not verify when the University Hospital residents were on TCH's campus. (*Id.*)

For the fiscal year ending June 30, 2009, TCH billed its fiscal intermediary for 24.19 FTE's in order to receive Medicare reimbursement. (Doc. 5 at ¶ 68). According to Plaintiff, TCH had no supporting documentation for these FTE's. (*Id.*) TCH billed Medicare for these FTE residents and was paid by Medicare for the costs associated with those residents. TCH submitted its CMS-2552 requesting reimbursement for the FTE external medical residents and was paid for these residents. (*Id.*)

### 3. *2010*

At the end of February and beginning of March 2010, Plaintiff claims that TCH continued to recognize that the documentation to support its request for resident reimbursement for the residents rotating from University, Jewish, Children's and Good Samaritan was insufficient to support a reimbursement claim. (Doc. 5 at ¶ 69). In a memorandum from Nick Motta, TCH's Manager of Reimbursement, he warned that the documentation was inadequate to support its request for reimbursement. (*Id.*) He wrote in part as follows:

All

I wanted to take a moment and provide a status update on the resident rotators from University, Jewish, Children's and Good Samaritan. Background:

• TCH currently receives around 24 FTEs from these providers, which are necessary for TCH to reach the current resident cap of 67.77.

• For fiscal year 2009, total medicare reimbursement for direct and indirect medical education was $11,150,000, with $3,165,000 attributed to the FTEs from other providers.

• Tracking 24 FTEs (not as easy as 24 employed FTEs)...FTE breakdown for FY09 based on IRIS data:

• 162 different residents training in 15 different residency programs for a total of 373 individual rotations (invoiced based on rotation).

Current Process:

Currently, we do not have an efficient process in place for tracking rotators. Certain individuals have been identified to review invoice detail based on the resident's program/department. Unfortunately, these dedicated individuals for each program/department do not always interact with the residents on a day-to-day basis.

The manual process is very time consuming and inefficient; we are unable to verify rotations and resolve issues in a timely manner. Out of professional courtesy, we are paying University invoices prior to 100% verification.

Through February 28, 2010, the status of the FY2010 (8 months) resident rotations are as follows:

| | | |
|---|---|---|
| • | Verified (215 rotations = 9.32 FTEs) | $ 804,620 |
| • | Need Follow-Up (68 rotations = 3.85 FTEs) | $ 306,905 |
| • | Need Verification (83 rotations = 3.43 FTEs) | $ 301,446 |
| • | Total Invoices | $1,412,971 |

Looking Forward:

12

> Glenda Overton and I plan to address the "Need Follow-up" and "Need
> Verification" rotations over the next couple months. We plan to revamp
> the current process in order to make it more efficient and accurate.
> Through our experience thus far, we realize that this process requires a
> significant amount of resources and is difficult to undertake given our other
> job responsibilities. If a dramatic increase in efficiency can not be obtained
> from a revamped process, it may be necessary to consider the addition of a
> part-time or full-time employee to manage the rotators.

(*Id.*, Ex. 14).

In addition to the inadequate documentation for the external FTEs, on July 14,

2010, Plaintiff alerted John Schroeder, the GME Committee Chairman and Program

Director for Internal Medicine, that various TCH residents were assisting TCH physicians

at third party surgery centers without a written agreement. (Doc. 5 at ¶ 70). This is a

violation of federal health care regulations. In an email dated that same day, Plaintiff

wrote:

> There is an agreement between Mercy Anderson and The Wellington
> Group. A PLA was sent to TCH to review and sign some time back. After
> review by TCH, the PLA was found to be incomplete in itself and there
> were no goals and objectives. TCH did not sign off on the agreement and
> asked them to rework the PLA, add the goals and objectives then resubmit
> to us for review and signature. This was not done. Sherry/O.R. is seeking
> direction and alerting us that three Fellows are currently assisting in the
> O.R. at Redbank and she does not want to be the one to tell Dr. Heidt that
> they are not allowed to assist without property credentialing and oversight
> by TCH.
>
> A fourth Fellow is also assisting at Redbank with Dr. Kulwin/Oculoplasty.

(*Id.*, Ex. 15).

On or about October 27, 2010, TCH and the Office of Inspector General ("OIG")

of the United States Department of Health and Human Services ("HHS") entered into a

CIA effective May 21, 2010. (Doc. 5 at ¶ 71). Pursuant to the agreement, TCH was obligated to perform numerous reviews of its operations and take steps relating to its agreements with third party physicians. (*Id.*) One of those obligations involved agreements with physicians which were identified as "focus arrangements." (*Id.*) Under the CIA, a focus arrangement was defined as:

> a.    is between TCH and any actual source of health care business or referrals to TCH and involves, directly or indirectly, the offer, payment, or provision of anything of value; or
>
> b.    is between TCH and any physician (or a physician's immediate family member) (as defined at 42 C.F.R.§ 411.351)) who makes a referral (as defined at 42 U.S.C. § 1395nn(h)(5)) to TCH for designated health services (as defined at 42 U.S.C. § 1395nn(h)(6)).

(*Id.*, Ex. 16 at 3).

In late 2010, TCH submitted its CMS-2552 for payment to Medicare. (Doc. 5 at ¶ 72). Included in the CMS-2552 was a request for payment relating to the external and/or contracted medical residents that performed services at TCH during fiscal year 2010 (July 1, 2009 – June 30, 2010). (*Id.*) Plaintiff claims that the request for payment for approximately 24 external medical residents was not supported by the appropriate audit quality documentation. (*Id.*)

### 4.    *2011*

Plaintiff again alleges that in 2011, TCH did not keep or prepare the required documentation in order to file its request for reimbursement with Medicare. (Doc. 5 at ¶ 73). In an effort to obtain the reimbursement for the FTE external medical residents costs, TCH decided to rely upon the external medical resident FTE submissions it had

previously made to CMS. (*Id.*) Plaintiff claims these calculations were inaccurate. (*Id.*)

On October 4, 2011, Plaintiff emailed Daniel Stafford, the Chief Compliance Officer for TCH, claiming that there were significant legal problems, especially under the CIA. (Doc. 5 at ¶ 74). Specifically, Plaintiff addressed unaccounted Medicare payments for external medical residents. (*Id.*, Ex. 17).

TCH recognized that its record keeping regarding external medical residents was inadequate. (Doc. 5 at ¶ 75). On October 11, 2011, Terrence Flynn, the Director of Reimbursement, Budget and Decision Support for TCH, emailed Jeffrey Gunnet, the TCH Reimbursement Manager, identifying the internal and external medical resident FTEs that were billed to Medicare on CMS-2552 for fiscal year 2010. (*Id.*, Ex. 18). According to Flynn, TCH had obtained reimbursement from CMS for the following resident count:

| Residency Description | Children's Hosp. Med | Christ Hosp. | Good Samaritan Hosp | Jewish Hosp. | University Hosp | Grand Total |
|---|---|---|---|---|---|---|
| Anesthesiology | | | | | 0.0877 | 0.0877 |
| Family Medicine | | 9.9302 | | | | 9.9302 |
| Family Medicine/Psychiatry | | | | | 3.2939 | 3.2939 |
| Internal Medicine | | 30.3791 | | | 3.9313 | 34.3104 |
| Neurological Surgery | | | | | 2.1561 | 2.1561 |
| Obstetrics & Gynecology | | 0.7709 | | | 8.1512 | 8.9221 |
| Oral and Maxillofacial Surgery | | | | | 0.0417 | 0.0417 |
| Orthopaedic Surgery | | | | | 0.0838 | 0.0838 |
| Pediatrics | 0.0677 | 0.8318 | | | | 0.8995 |
| Pediatrics/Physical Med. & Rehab. | 0.1535 | | | | | () 1535 |
| Physical Medicine & Rehabilitation | | | | | 0.3261 | 0.3261 |
| Plastic Surgery | | | | | 0.1452 | 0.1452 |
| Preliminary Medicine | | | | | 0.6629 | 06629 |
| Psychiatry | | | | | 0.5755 | 0.5755 |
| Radiology | | | | | 0.1534 | 0.1534 |
| Radiology, Diagnostic | | | | | 0.682 | 0.682 |
| Surgery | | | 0.7534 | 0.4958 | 4.4785 | 5.7277 |
| Grand Total | 0.2212 | 41.912 | 0.7534 | 0.4958 | 24.7693 | 68.1517 |

15

(*Id.*) Gunnet emailed Plaintiff indicating that: "He said it is the best we can do with the information we have." (*Id.* at ¶ 76, Ex. 18).

In correspondence dated October 17, 2011, Mr. Gunnet told Plaintiff that TCH continued to pay residents who were not identified as employees. (Doc. 5 at ¶ 77, Ex. 19). In an email dated October 18, 2011, Plaintiff told Gunnet that for the previous four years, TCH had hired different individuals to complete the medical cost report relating to the reimbursement for residents, but there was no supporting documentation for the third party contracted residents. (*Id.* at ¶ 78, Ex. 20).

Plaintiff forwarded an email dated October 31, 2011 to Dan Stafford in an attempt to educate him about federal health care regulations regarding graduate medical education reimbursement. (Doc. 5 at ¶ 79, Ex. 21). Subsequently, on November 1, 2011, Gunnet forwarded Plaintiff information relating to 2011 resident accounts for which payment had been submitted to CMS. (*Id.* at ¶ 80). TCH identified that it had submitted a request for reimbursement for 25.17 FTE external medical residents. (*Id.*) The estimated reimbursement from Medicare for these residents was $186,000 per resident. (*Id.*, Ex. 22).

In 2011, TCH submitted CMS-2552 to Medicare requesting payment for the medical residents associated with its graduate medical program. (Doc. 5 at ¶ 81). The total request for payment included 69.6295 medical residents. (*Id.*) Of the total number of residents, 25.17 FTE medical residents were external. (*Id.*) Plaintiff claims that TCH had no audit quality documentation to support a request for reimbursement for these

external medical residents. (*Id.*)

In late October and/or early November 2011, Plaintiff again informed Daniel Stafford that TCH was violating federal law by submitting cost reports and billing Medicare for reimbursement of contracted and/or external medical residents for which it had no supporting documentation. (Doc. 5 at ¶ 82). On November 18, 2011, Plaintiff requested a follow up meeting with Stafford to discuss the issues she had previously brought to his attention relating to the graduate medical education reimbursement problems that existed at TCH. (*Id.* at ¶ 83, Ex. 23).

### 5. *2012*

Throughout 2012, Plaintiff continued to inquire as to the status of TCH's investigation relating to its activities in billing Medicare for FTE medical residents. (Doc. 5 at ¶ 88).

Additional issues arose in 2012. For example, in correspondence dated January 17, 2012, Dan Stafford wrote to various individuals at TCH identifying the importance of obtaining physician signatures on focus arrangements before the physician provides services. (Doc. 5 at ¶ 89). Stafford emphasized that all focus arrangements must be in writing. (CIA § III.D.2a; Doc. 5 at ¶ 89). Plaintiff claims that TCH also failed to obtain the signatures of numerous residents before they commenced service for TCH during 2012. (*Id.* at ¶ 91). For example:

    a.    The Christ Hospital 2011/2012 GME Contract between TCH and Meram Khabbaz: date of commencement September 1, 2011, date of signature January 6, 2012. (*Id.*, Ex. 27).

17

b.    The Christ Hospital 2011/2012 GME Contract between TCH and Sara Goldsberry: date of commencement July 1, 2011, date of signature January 6, 2012. (*Id.*, Ex. 28).

c.    The Christ Hospital 2011/2012 GME Contract between TCH and Robert Pica: date of commencement July 1, 2011, date of signature February 22, 2012. (*Id.*, Ex. 29).

d.    The Christ Hospital Employment Agreement effective as of September 1, 2011 between TCH and Ankur Bharija, M.D. was not executed until October 10, 2011. (*Id.*, Ex. 30).

e.    The Christ Hospital 2011/2012 GME contract between TCH and Elizabeth Brown: date of commencement July 1, 2011, date of signature February 10, 2012.

(*Id.*, Ex. 31).

In response to these and other contract issues, Plaintiff wrote an email on February 24, 2012 to numerous TCH executives. (Doc. 5 at ¶ 92, Ex. 32).

On February 24, 2012, Plaintiff continued to inform TCH of its conduct:

It is a government violation to have resident doctors not under contract doing hands on with patients. Current contracts would not hold up in court as they stand with multiple errors currently in their contracts.

From the Institutional Office of GME, I am attempting to assist our Compliance department and Mark with what should have been corrected in the contracts from the beginning. Unfortunately, I did not see any of the resident/fellows contracts prior to now, or I could have offered my assistance from the beginning, which would have avoided all the errors that accured do to lack of knowledge and expertise from those without Institutional GME expertise.

(Doc. 5 at ¶ 93, Ex. 32).

Nevertheless, Plaintiff claims TCH knowingly submitted requests for payment to Medicare pursuant to CMS-2552 in 2011 and 2012 for internal medical residents for

whom it had no contractual arrangement before the medical residents started their

employment with TCH. (Doc. 5 at ¶ 94).

Throughout 2012, Plaintiff claims that TCH continued to ignore its legal

obligation under federal health care regulations in billing Medicare for external medical

resident FTEs for whom it had inadequate documentation. (Doc. 5 at ¶ 96). For

example, an email dated May 8, 2012 from Mr. Gunnet to the Manager for

Reimbursement at TCH stated:

> I was talking with Tena earlier this morning and she suggested that I
> contact each of you to see if you can help me with some rotation data for
> the residents that pass through your areas. First of all, please note that
> this email and any conversation are to be held in absolute confidence. It
> relates to an audit being performed by an outside consultant and their
> information request.
>
> What is needed is supporting information with regard to who was here.
> when were they here, what were they doing (didactic vs clinical) and any
> time off taken during the period they were to be here or time taken here
> that was not part of their training program. The periods in question begin
> with FY2008 (7/1/2007- 6/30/2008) and include 2009, 2010 and 2011. If
> you have any questions, please call me to discuss. This request is time
> sensitive so I need to ask you to please gather this information as quickly
> as you are able to do so.

(*Id.*, Ex. 33).

Plaintiff continued to express her concerns about TCH's failure to follow the

federal health care regulations as they relate to TCH's medical residents. (Doc. 5 at

¶ 97). Plaintiff learned that TCH had hired, in late 2011 or early 2012, W. Timothy

Vanderford, Jr. from HFS Consultants, to review the medical residency program. (*Id.*)

In June 2012, Plaintiff met with HFS Consultants and explained TCH's conduct between

2007 and 2012. (*Id.* at ¶ 98).

Plaintiff continued to inquire as to the progress of the outside consultant

investigation. (Doc. 5 at ¶ 99). On July 25, 2012, Plaintiff was presented with a

Corrective Action Notice from her supervisor, Dr. Robert Strub. (*Id.* at ¶ 105). Plaintiff

was accused of refusing to perform work and sending a disrespectful, unprofessional, and

inappropriate email to a co-worker. (*Id.*) She was verbally counseled on that date. (*Id.*,

Ex. 35).

Plaintiff forwarded a document entitled Response to Corrective Notice 07/25/12.

(Doc. 5 at ¶ 106). In that document, she disputed the claims that she had violated TCH

policy. (*Id.*) She reiterated that over the previous four and a half years, she had

expressed numerous concerns on multiple occasions related to "possible TCH illegal

practices and unethical behavior." (*Id.*) She wrote:

> Clearly, TCH has obstructed administrative internal reporting issues with
> multiple violations that will need further review and corrective action. In
> addition, the CIA agreement imposed on TCH clearly instructs TCH to
> log and report concerns. My concerns raised over the past four years
> were not reported to the OIG and have not been investigated by the OIG.
> My corrective actions and legal obligations are to report all findings of
> illegal activity and unethical behavior. All retaliation by TCH towards
> me will be reported as well. Any further retaliations for reporting my
> concerns will also be brought to the forefront of our judicial system to be
> sure corrective action will be taken.

(*Id.*, Ex. 36).

Thereafter, on July 27, 2012, Plaintiff met with Elizabeth Johnson, Vice President

and Chief Compliance Officer at TCH, and Jessica Appleby, in house counsel for TCH.

(Doc. 5 at ¶ 107). She identified the problems that she had complained about over the

previous four years. (*Id.*) Plaintiff met a second time on July 30, 2012 with Ms.

Appleby. (*Id.*) Subsequently, Ms. Johnson forwarded an email to Plaintiff claiming that

she was being uncooperative. (*Id.*, Ex. 37).

On July 31, 2012, Plaintiff called OIG/HFS and provided a verbal report that TCH

was violating federal regulations, the CIA, various HIPAA violations, and others. (Doc.

5 at ¶ 108). Plaintiff provided her name, address, and phone number as the "relator of

information." (*Id.*) Plaintiff explained that:

- Residents and Fellows work without contracts, which are required by the accrediting body.
- External rotating residents and fellows from area hospitals performing surgeries without prior credentialing, verification.
- Those undocumented residents writing prescriptions on TCH Rx pads and the pharmacies were unable to fill them without authorization from TCH.
- Residents report feeling intimidated while participating in TCH's Internal Medicine program.
- Research grant fraud - orthopaedics research fellows actually performing surgeries, possibly without medical licenses.
- TCH billing VA illegally by passing billing of TCH residents through University Hospital, since TCH and VA have no Master Affiliation Agreement.

(*Id.*)

On August 6, 2012, TCH removed all documentation from Plaintiff's computer.

(Doc. 5 at ¶ 110, Ex. 39). On November 15, 2012, TCH terminated Plaintiff. (*Id.* at

¶ 113).

### E. Medical Fellowship Contracts

TCH has research fellowship contracts that it awards to individuals in the

orthopaedic surgery division. (Doc. 5 at ¶ 114). The contracts are entered into with

21

individuals who allegedly graduated from foreign medical schools and are not licensed to practice medicine in the State of Ohio. (*Id.*, Ex. 40). While at TCH, these research fellows are not permitted to perform or assist in surgery on patients admitted to TCH. (*Id.* at ¶116). However, Plaintiff claims that some fellows did participate as surgery assistants for which TCH billed Medicare in 2007 through 2012. (*Id.*)

## II.    STANDARD OF REVIEW

The False Claims Act "is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc. (Bledsoe I)*, 342 F.3d 634, 640 (6th Cir. 2003). Defendant moves to dismiss Plaintiff's Amended Complaint under Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure. (Doc. 11). Defendant argues that Plaintiff: (1) fails to state a claim upon which relief can be granted; and (2) fails to plead fraud with both the particularity and plausibility required by law. (*Id.*)

### A. Rule 12(b)(6) Motion to Dismiss Standard

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

### B. Rule 9(b) Particularity Standard

Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The Court of Appeals for the Sixth Circuit has consistently held that a complaint alleging False Claims Act violations "must allege the underlying facts with particularity as required by Rule 9(b)." *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 445 (6th Cir. 2008); *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc. (Bledsoe II)*, 501 F.3d 493, 509 (6th Cir. 2007); *Bledsoe I*, 342 F.3d at 641. "To satisfy Rule 9(b), a complaint of fraud, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which the plaintiff relied; the fraudulent scheme, the fraudulent intent of the defendants; and the injury resulting from the fraud." *Marlar*, 525 F.3d at 444 (quoting *Bledsoe I*, 342 F.3d at 643). "Where a complaint alleges a complex and far-reaching fraudulent scheme, then that scheme must be pleaded with particularity and the complaint must also provide examples of specific fraudulent conduct that are representative samples of the scheme." *Id.* at 444–45 (quoting *Bledsoe II*, 501 F.3d at 510).

However, Rule 9(b) is not to be read in isolation; it must be interpreted in conjunction with Rule 8. *Bledsoe II*, 501 F.3d at 503 (citing *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988)). Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 embodies "a regime of 'notice pleading' where technical pleading requirements are rejected in favor of an approach designed to reach the merits of an action." *Bledsoe II*, 501 F.3d at 503 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)). "When read against the backdrop of Rule 8, it is clear that the purpose of

Rule 9 is not to reintroduce the formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *Id.* In other words, "Rule 9(b) is intended to provide defendants with 'notice of the specific conduct with which they were charged,' so that the defendants can prepare responsive pleadings." *Marlar*, 525 F.3d at 445 (quoting *Bledsoe II*, 501 F.3d at 510).

The Sixth Circuit has further held that "pleading an actual false claim with particularity is an indispensable element" of a False Claims Act complaint, as opposed to merely pleading "a false scheme." *Bledsoe II*, 501 F.3d at 504. The circumstances constituting fraud for the purposes of the False Claims Act "must include an averment that a false or fraudulent claim for payment or approval has been submitted to the government. . . ." *Id.* This requirement, however, does not "foreclose the possibility of a court relaxing this rule in circumstances where a Plaintiff demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the Plaintiff cannot produce such allegations is not attributable to the conduct of the Plaintiff." *Id.* at 504 n.12. Allegations of fraud may be based on "information and belief," but "the complaint must set forth a factual basis for such belief, and the allowance of this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Id.* (quoting *U.S. ex rel. Thompson v. Columbia/CHA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

Additionally, a plaintiff is not required to plead the identity of the specific individual who submitted false claims to the government. *Bledsoe II*, 501 F.3d at 506. "[W]hile such information is relevant to the inquiry of whether a Plaintiff has pled the circumstances constituting fraud with particularity, it is not mandatory." *Id.* Pleading only the identity of the corporation responsible for the false or fraudulent claim satisfies Rule 9(b)'s particularity requirement. *Id.* Furthermore, there is no requirement to plead the identity of employees within a corporate defendant who made allegedly false or fraudulent claims. *Id.* at 507.

If a complaint alleges separate and unrelated fraudulent conduct, a "paragraph-by-paragraph" analysis is required. *Bledsoe II*, 501 F.3d at 509. However, where a plaintiff pleads a complex and far-reaching fraudulent scheme that alleges many false claims over a substantial period, pleading every instances of fraud "would be extremely ungainly, if not impossible." *Id.* (quoting *U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F.Supp.2d 39, 49 (D. Mass 2001)). "[W]here a Plaintiff pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a Plaintiff may proceed to discovery on the entire fraudulent scheme." *Id.* at 510. In practice, this means that the examples of the fraudulent scheme that a plaintiff provides must be representative samples of the broader class of claims. *Id.* "The examples of false claims pled with specificity should, in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, be such that a

26

materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims." *Id.* at 511.

A complaint is sufficient under Rule 9(b) if it alleges "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud," and enables defendants to "prepare an informed pleading responsive to the specific allegation of fraud." *Id.* at 509 (quoting *Bledsoe I*, 342 F.3d at 643). Rule 9(b) only relates to count one, two, and three of Plaintiff's Amended Complaint. (Doc. 5). It has no bearing on Plaintiff's allegation of retaliation. *See U.S. ex rel. Elms v. Accenture LLP*, 341 F. App'x 869, 873 (4th Cir. 2009) ("[A] retaliation claim is not subject to the heightened pleading standard of Rule 9(b).").

### III. ANALYSIS

#### A. Violations of the False Claims Act (Counts I, II, III)

Counts one, two, and three of Plaintiff's Amended Complaint allege violations of the False Claims Act. (Doc. 5). The purpose of the False Claims Act is "to provide for restitution to the government for money taken from it by fraud." *U.S. ex rel. Augustine v. Century Health Servs.*, 289 F.3d 409, 413 (6th Cir. 2002) (quoting *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 551 (1943)). The FCA allows a private individual to bring suit on behalf of himself or herself as well as the government. 31 U.S.C. § 3730(b)(1).

Specifically, Plaintiff alleges claims under three different sections of both the 1986 and 2009 versions of the FCA:[8]

- Section 3729(a)(1) established liability for direct false claims (Count 1).  (Doc. 5 at ¶ 117-119).[9]

- Section 3729(a)(2) established liability for causing the submission of a false claim (Count II).  (Doc. 5 at ¶¶ 120-124).[10]

- Section 3729(a)(7) the reverse false claims provision, imposed liability for submitting false records or making false statements to reduce or avoid an obligation to the government (Count III).  (Doc. 5 at ¶¶ 126-132).[11]

To prevail on a FCA claim, Plaintiff must prove that: "(1) a person presents, or causes to be presented, a claim for payment or approval; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken 'knowingly,' i.e., with the actual knowledge of the information, or with deliberate ignorance or reckless disregard of the truth or falsity of the claim." *Bledsoe II*, 501 F.3d at 503.

---

[8] The FCA was amended on May 20, 2009.  What was previously § 3729(a)(1) is now § 3729(a)(1)(A); what was previously § 3729(a)(2) is now §3729(a)(1)(B); and what was previously § 3729(a)(7) is now § 3729(a)(1)(G).  The amended version of subparagraphs (a)(1), (a)(2), and (a)(7) apply to conduct on or after the date of enactment.  The amended version of subparagraph (b) took effect as if enacted on June 7, 2008 and applies to all cases under the FCA that were pending on or after that date.  *U.S. ex rel. Sanders v. Allison Engine Co.*, 703 F.3d 930 (6th Cir. 2012).

[9] Section 3729(a)(1)(A) establishes liability for knowingly presenting, or causing to be presented, a false claim or fraudulent claims for payment or approval (Count I).  (Doc. 5 at ¶¶ 117-119).

[10] Section 3729(a)(1)(B) establishes liability for knowingly making, using, or causing to be made, or used, a false record or statement material to a false claim (Count II).  (Doc. 5 at ¶¶ 120-124).

[11] Section 3729(a)(1)(G) establishes liability for knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay for transmitting money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government (Count III).  (Doc. 5 at ¶¶ 126-132).

### 1. Scienter requirement

The third element of an FCA claim subjects defendants to liability "if they had 'actual knowledge' of the falsity of their claims or acted with 'deliberate ignorance' or 'reckless disregard' of the truth or falsity of their claims." *U.S. v. Sci. Application Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010). Plaintiff alleges that TCH violated the FCA by submitting false cost reports, because it did not have documentation to verify the reports. (Doc. 5). However, Defendant argues that because Plaintiff failed to specifically identify "who signed the allegedly false statement," she has failed to plead that any individual at TCH had the requisite scienter to violate the FCA. (Doc. 11 at PageID 1044).

A plaintiff is not required to plead the identity of the individuals who submitted false claims at the pleading stage. *Bledsoe I*, 501 F.3d at 506. "Pleading the identity of the corporation responsible for the false or fraudulent claim satisfies Rule 9(b)'s particularity requirement." *Id.* (emphasis added). "Furthermore, there is no requirement to plead the identity of employees with a corporate defendant who made allegedly false and fraudulent claims." *Id.* at 507. An allegation that the corporation knowingly presented or caused to be presented a false or fraudulent claim is sufficient to plead the necessary scienter for a FCA claim. *U.S. ex rel. Elliott v. Brickman Group, Ltd. LLC*, No. 1:10cv392, Opinion and Order, at *11 (S.D. Ohio Aug. 25, 2011) (unpublished) (citing *U.S. ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496, 505 n.7 (6th Cir. 2008)).

Therefore, Plaintiff's FCA claims satisfy the scienter requirement.

29

## 2. *Materiality requirement*

The FCA recognizes two types of actionable claims – factually false claims and legally false claims. In a "factually false" claim, proving falsehood is relatively straightforward: a plaintiff must generally show that the government payee submitted "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *U.S. ex. rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2001) (citing *Mikes v. Strauss*, 271 F.3d 687, 697 (2d Cir. 2001)). In contrast, in a "legally false" claim, the Plaintiff must demonstrate that the defendant "certifie[d] compliance with a statute or regulation as a condition to government payment," yet knowingly failed to comply with such statute or regulation. *Id.* This case is premised on a legal falsehood.

Legally false certification claims can rest on one of two theories – express false certification or implied false certification. An express false certification theory applies when a government payee "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Conner*, 543 F.3d at 1218 (citing *Mikes,* 271 F.3d at 98).[12] In contrast, under an implied false certification theory, the analysis focuses on the underlying contracts, statutes, or regulations to ascertain whether compliance is a prerequisite to the government's payment. *Id.* If a defendant knowingly violates such a condition while attempting to

---

[12] Since 2002, the Sixth Circuit has recognized that is not necessary to specifically plead an express certification for a defendant to be liable under the FCA. *Augustine*, 289 F.3d at 413.

collect renumeration from the government, it may have submitted an impliedly false claim.  *Id.*  Plaintiff alleges implied false certification.  (Doc. 13 at PageID 1022).[13]

Under the implied false-certification theory, courts focus on "the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment."  *Hobbs*, 711 F.3d at 714 (citing *Conner, 543 F.3d at 1220*).  Therefore, liability attaches to a claim by virtue of the defendant's violation of its continuing duty to comply with the regulations on which payment is conditioned.  *Id.*  In this case, TCH had a continuing duty to comply with 42 C.F.R. §§ 413.2 and 413.24.  However, an implied false certification theory only applies where the underlying regulation is a "condition of payment," meaning that the government would not have paid the claim had it known the provider was not in compliance with the law.  *Id.*

The success of a false certification claim depends on whether it is based on "conditions of participation" in the Medicare program (which <u>do not</u> support a FCA claim) or "conditions of payment" from Medicare funds (which <u>do</u> support FCA claims).  *See Hobbs*, 711 F.3d at 714.  Plaintiff's implied false certification claim rests on the assertion that TCH submitted claims to Medicare for reimbursement of direct and indirect costs associated with the residents in its GME program without the proper supporting financial documentation.  (Doc. 13 at PageID 1109).

---

[13] Under this theory, a facially truthful claim can be construed as false if the claimant violates its continuing duty to comply with a statute or regulation on which payment of a claim is conditioned.  *U.S. ex rel. Hobbs v. MedQuest*, 711 F.3d 707 (6th Cir. 2013).

In order to be reimbursed by Medicare, TCH must maintain the information set forth in 42 C.F.R. § 413. Pursuant to 42 C.F.R. § 413.20(a), providers submitting financial data and reports to the Medicare program must maintain "sufficient financial records and statistical data for proper determination of costs payable under the program." The regulation goes on to state that "the methods of determining costs payable under Medicare involve making use of data available from the institution's basis accounts, as usually maintained, to arrive at equitable and proper payment for services to beneficiaries." 42 C.F.R. § 413.20(a). Likewise, 42 C.F.R. § 413.23(a) requires that providers receiving payment on the basis of reimbursable costs provide "adequate cost data," which must be "based on their financial and statistical records which must be capable of verification by qualified auditors." 42 C.F.R. § 413.24(a).

Recently, the district court for the District of Columbia held that submission of cost reports without possession of supporting documentation satisfied the implied false certification theory. *U.S. ex rel. Davis v. District of Columbia*, No. 06–629, 2014 U.S. Dist. LEXIS 42725, at *28 (D.D.C. Mar. 31, 2014). The court recognized that federal regulation "requires health care providers to maintain documentation that is capable of verification by qualified auditors." *Id.* at 29. Compliance with these regulatory provisions are material to the government's decision to pay because "the regulatory mandate to maintain audit quality documentation that allows proper determination of costs payable, 42 C.F.R. § 413.20(a), would be toothless if the government would reimburse for unsupported claims." *Id.* at 36. Therefore, submitting a claim for

reimbursement without the supporting documentation is both false under the FCA and material to the government's decision to pay.

Defendant relies on the Tenth Circuit's opinion in *U.S. ex rel. Conner v. Salina Reg'l Health Ctr.*, which held that "although the government considers substantial compliance a condition of ongoing Medicare participation, it does not require perfect compliance as an absolute condition to receiving Medicare payments for services rendered." 543 F.3d at 1221. In other words, the "cost report certification theory" is a condition of participation, not a condition of payment. However, *Conner* is distinguishable from this case, because the plaintiff did not proceed on an implied certification theory. Instead, the plaintiff in *Conner* based his FCA claim on a theory of express false certification. *Id.* at 1218.[14]

In examining whether the plaintiff could withstand a motion to dismiss, the Tenth Circuit adopted a materiality requirement in the context of false certification claims under the FCA. *Conner*, 543 F.3d at 1220. Specifically, the viability of a FCA claim was conditioned on whether the statutory provision alleged to have been violated was a condition of participation or a condition of payment. *Id.* The Tenth Circuit refused to

---

[14] The court summarized plaintiff's position as follows:

> By arguing that the certification language is adequate to create an express false certification claim, *Conner* fundamentally contends that any failure by SRHC to comply with any underlying Medicare statute or regulation during the provision of any Medicare reimbursable service renders this certification false and the resulting payments fraudulent.

*Conner*, 543 F.3d at 1219.

adopt the plaintiff's "sweeping annual cost report false certification theory" because the express certification in the annual cost report represented the provider's assurance that it continued to comply with the requirements of Medicare. *Id.* at 1221. The appellate court recognized, however, that when an express certification does not state that compliance is a prerequisite to payment, a court must look to the underlying statutes to "surmise if they make the certification a condition of payment." *Id.* at 1218. Thus, the court "emphasized that our resolution of this case does not preclude the possibility that certain Medicare statutes or regulations might expressly or explicitly condition payment on certification of compliance under a false certification theory." *Id.* at 1222.

In this case, Plaintiff does not allege that the express certifications on the 2007 - 2011 cost reports are the basis for the government's FCA claims. Instead, Plaintiff proceeds on an implied certification theory, relying upon the statutory and regulatory provisions which condition payment on audit quality documentation. (Doc. 13 at PageID 1109).

Accordingly, TCH's submission of cost reports without supporting documentation satisfies the implied false certification theory for FCA liability.

### 3. 9(b) Particularity requirement

As explained in Section II;B *supra*, "pleading an actual false claim with particularity is an indispensable element" of a False Claims Act complaint, as opposed to merely pleading "a false scheme." *Bledsoe II*, 501 F.3d at 504. The circumstances constituting fraud for purposes of the False Claims Act "must include an averment that a

false or fraudulent claim for payment or approval has been submitted to the government

. . . ." *Id.* The parties agree that, pursuant to Rule 9(b), complaints alleging FCA

violations require that a plaintiff "allege the time, place, and content of the alleged

misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent

of the defendants; and the injury resulting from the fraud." *Yuhasz v. Brush Wellman,*

*Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (*quoting Coffey v. Foamex L.P.*, 2 F.3d 157, 161–

62 (6th Cir. 1993)).

Plaintiff identified each of these 9(b) particularity requirements: (a) the <u>time</u> of the

alleged fraudulent conduct was between 2007-2011; (b) the <u>place</u> of the alleged

fraudulent conduct was at Christ Hospital or at the location of a third party consultant at

the direction of Christ Hospital; (c) the <u>content</u> of the alleged misrepresentation was the

request for GME expense reimbursement without the documentation required under

various Medicare regulations; (d) the alleged fraudulent <u>intent</u> was TCH knowingly

submitting reports without the proper documentation to support the costs it requested; and

(e) the alleged <u>injury</u> resulting from the fraud are the cost reimbursements TCH received

from 2007-2011. (Doc. 13 at PageID 1117-1120).

Although Plaintiff does not identify particular residents who lacked the requisite

documentation, the 9(b) particularity requirement does not "foreclose the possibility of a

court relaxing this rule in circumstances where a Plaintiff demonstrates that he cannot

allege the specifics of actual false claims that in all likelihood exist, and the reason that

the Plaintiff cannot produce such allegations is not attributable to the conduct of the

Plaintiff." *Bledsoe II*, 501 F.3d at 504. Because Plaintiff was terminated from her position, discovery is necessary to flesh out the evidence regarding TCH's alleged fraudulent conduct. Rule 9(b) "is intended to provide defendants with 'notice of the specific conduct with which they were charged,' so that the defendants can prepare responsive pleadings." *Marlar*, 525 F.3d at 445 (*quoting Bledsoe II*, 501 F.3d at 510). Plaintiff's complaint put Defendant on notice and did so with enough specificity to satisfy the 9(b) particularity requirements.

### *4. Corporate Integrity Agreement Claim (Count III only)*

In Count three of Plaintiff's Complaint, Plaintiff alleges that in 2011 and 2012, TCH knowingly submitted requests for payment pursuant to CMS-2552 for residents without signed employment contracts. (Doc. 13 at PageID 1117). Plaintiff claims that this is a violation of the CIA, which requires certain agreements to be in writing. (CIA § III.D.2a; Doc. 5 at ¶ 89).[15] Plaintiff alleges that because the signatures on certain agreements were not finalized until after the residents began working at TCH, this constitutes a false claim. (Doc. 5 at ¶ 91).

First the Court must consider whether a violation of a CIA can give rise to an FCA claim. This Court adopts the reasoning of the Eleventh Circuit in *U.S. ex rel. Metheny*, 671 F.3d 1217, 1223 (11th Cir. 2012), finding that "to sustain a reverse false claim action, plaintiff must show that the defendants owed an obligation to pay money to the

---

[15] The CIA requires Defendants to remit payments from the government that lacked sufficient documentation and payments received in duplicate or in error. (Doc. 13 at PageID 1113). The CIA defined these payments as "Overpayments." (*Id.*) Defendants were required to return all Overpayments within thirty days of identification. (*Id.*)

United States at the time of the allegedly false statements." "An express contractual obligation to remit excess government property is a definite and clear obligation for FCA purposes." *Id.* A "written contract which expressly obligated [defendant] to be responsible and accountable for the government property in its possession and to return that property ... in accordance with the government's instructions is a sufficient obligation." *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236–1237 (11th Cir. 1999).

Here, the Complaint contains allegations relating to Defendant's contractual obligation to identify, report, and remit excess government money in accordance with the CIA's instructions. (Doc. 5 at ¶ 128). Specifically, Plaintiff alleges that pursuant to the CIA, Defendants were required to report and remit all Overpayments[16] within thirty days of identification. (Doc. 13 at PageID 1113). This allegation is supported by the express language of the CIA, which states that

> [i]f at any time, TCH identifies any Overpayment, TCH shall repay the Overpayment to the appropriate payor (e.g., Medicare fiscal intermediary or carrier) within 30 days after identification of the Overpayment and take remedial steps within 60 days after identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem and the Overpayment from recurring.

(CIA § III.I.2a).

Plaintiff alleged that Defendant had an express contractual obligation to remit Overpayments within thirty days of identification and defined that obligation in detail

---

[16] The CIA defines Overpayments as "the amount of money TCH has received in excess of the amount due and payable under any Federal health care program requirements." (CIA § III.I.1)

with references to particular contract sections. (Doc. 13 at PageID 1111-1117). These factual allegations are sufficient to plead a violation of the CIA.

Although a violation of a CIA can give rise to an FCA claim, the Complaint fails to state a claim upon which relief can be granted. Plaintiff claims that Defendant failed to adhere to the CIA by obtaining timely signatures of numerous residents prior to the time they commenced in 2012. (Doc. 13 at PageID 1117). However, the language of the CIA that addresses Focus Arrangements only requires TCH to "ensure that each Focus Arrangement is set forth in writing and signed by TCH and the other parties to the Focus Arrangement." (CIA § III.D.2a). It is undisputed that TCH had written, signed arrangements with residents. There is no requirement that these arrangements had to be signed before a resident could provide services.[17]

Additionally, Plaintiff argues that the CIA created an obligation that TCH report claims of fraud, like those made by Plaintiff, to HHS/OIG. (Doc. 13 at PageID 1117). This allegation is conclusory. Plaintiff cites language in the CIA regarding a disclosure program, but fails to state what should have been disclosed or what was not disclosed to OIG.[18] (*Id.* at PageID 1112).

---

[17] Plaintiff has 21 days to file a motion for leave to amend if she can point to a section of the CIA that details an alleged time requirement.

[18] Throughout her memorandum contra, Plaintiff argues that Defendant violated the CIA by receiving "overpayments." However, Plaintiff fails to argue which payments constitute overpayments under the CIA. Instead, Plaintiff uses sweeping and conclusory language indicating that TCH has been "overpaid" for its residency program since 2007 and must remit these payments. (Doc. 5 at PageID 562).

Therefore, Plaintiff's claim that TCH violated the CIA, thereby giving rise to an FCA claim, fails as a matter of law.[19]

Accordingly, Count three is dismissed. Counts one and two, however, survive because Plaintiff has stated a claim upon which relief can be granted.

**B. False Claims Act Retaliation (Count IV)**

The FCA prohibits, among other things, the making of false or fraudulent claims for payment or approval to the United States, or the making of a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a). To encourage enforcement of the FCA's provisions, the FCA provides an individual with relief from any retaliatory actions. 31 U.S.C. § 3730(h). Plaintiff alleges that she was terminated in violation of 31 U.S.C. § 3730(h). (Doc. 5 at ¶ 136).

In arguing that Plaintiff's retaliation claim should be dismissed, TCH relies upon a pre-2009 version of Section 3730(b) that is no longer applicable.[20] The new version significantly expands the protected conduct which will support a claim under Section 3730(h). The addition of the phrase "other efforts to stop 1 or more violation of this chapter" broadens the protection of 3730(h). *U.S. ex rel. Elliott v. Brickman Group, Ltd. LLC,* No. 1:10cv392, Opinion and Order, at *22 (S.D. Ohio Aug. 25, 2011)

---

[19] Because Plaintiff's allegations of overpayments under the CIA fail as a matter of law, the Court declines to address the issue of liability for the retention of these overpayments.

[20] The prior version of Section 3730(h) limits a plaintiff to pleading facts demonstrating that the defendant has been put on notice that plaintiff was either taking action in furtherance of a private qui tam action or assisting in a FCA action brought by the government. *Elliott* at 24. Under the old language, any claim has to be directly related to a qui tam action. *Id.* This is no longer a valid interpretation of Section 3730(h). *Id.* at 26.

(unpublished). Protected activity now includes any act by an employee to stop a violation of the FCA, whether it involves a specific qui tam action or not. *Id.* at 25. Protected activity is to be interpreted broadly. False Claims Amendments Act of 1986, S. Rep. No. 99-345, § 6, at *32 (1986).

Accordingly, investigations, inquiries, testimonies, or other activities that concern the employer's knowing submission of a false or fraudulent claim for payment to the government are protected activity under Section 3730(h). *Elliott* at 26-27. Whether the conduct actually led to or arose from the filing of a FCA action does not directly impact whether the conduct is protected. *Id.* at 26. Complaints alleging false billing practices that trigger an investigation are considered protected activity under the amended version of Section 3703(h). *Id.* at 28-29.[21]

In analyzing Plaintiff's retaliation claim, the Court looks for "proof that the plaintiff was (1) engaged in a protected activity; (2) that her employer knew that she was engaged in a protected activity; and (3) that her employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Marlar*, 525 F.3d at 449 (*quoting Yuhasz*, 341 F.3d at 566).

Here, Defendant does not contest that Plaintiff's employers knew that she was engaged in a protected activity or that her employer discharged or otherwise discriminated against her as a result of that protected activity. Defendant only contests

---

[21] *See also Jones-McNamara v. Holzer Health Sys., Inc.*, No. 2:13cv616, 2014 U.S. Dist. LEXIS 864, at *10-11 (S.D. Ohio, Apr. 28, 2014) (the amended statute presents a distinctly broader category of protected activity which could take the form of trying to stop misconduct by external or internal means, which includes reporting violations up a company's chain of command).

whether Plaintiff was engaged in protected activity. Plaintiff's complaint is replete with allegations that for more than four years, she reported unlawful conduct relating to TCH's billing practices. (Doc. 5). These allegations qualify as "other efforts to stop 1 or more violations," protected activity under the FCA. *See* 31 U.S.C. § 3730(h)(1).

Accordingly, Plaintiff states a cause of action for retaliation under the FCA.

## IV. CONCLUSION

Accordingly, for these reasons, Defendant's motion to dismiss (Doc. 11) is **GRANTED IN PART** and **DENIED IN PART** as set forth above.

**IT IS SO ORDERED**.

Date: 12/31/14        */s/ Timothy S. Black*
            Timothy S. Black
            United States District Judge